IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01041-NYW

TANA LYNN RANKIN,

     Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,[1]

     Defendant.

---

## MEMORANDUM OPINION AND ORDER

Magistrate Judge Nina Y. Wang

     This civil action comes before the court pursuant to Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33 and 1381-83(c) for review of the Commissioner of Social Security's final decision denying the application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") by Plaintiff Tana Lynn Rankin ("Plaintiff" or "Ms. Rankin"). This civil action was referred to the Magistrate Judge for a decision on the merits pursuant to the Order of Reference dated October 12, 2016 [#17], and under 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2. The court has carefully considered the Complaint filed May 9, 2016 [#1], Plaintiff's Opening Brief filed August 17, 2016 [#14], Defendant's Response Brief filed September 7, 2016 [#15], Plaintiff's Reply Brief filed September 21, 2016 [#16], the entire case file, the administrative record, and applicable case law.

---

[1] This action was originally filed against Carolyn Colvin, as Commissioner of the Social Security Administration. Commissioner Berryhill succeeded Commissioner Colvin as Acting Commissioner of the Social Security Administration on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, this court automatically substitutes Acting Commissioner Berryhill as Defendant in this matter.

For the following reasons, I respectfully **REVERSE and REMAND** the Commissioner's decision.

## BACKGROUND

Ms. Rankin filed applications for DIB and SSI in February 2013.  *See* [#10-5 at 172, 176].[2]  She alleged in the applications that she has been disabled since December 10, 2012, at the age of twenty-eight, as a result of right optic neuritis, multiple sclerosis ("MS"), anxiety, mood disorder due to general medical condition, and depression.  Ms. Rankin has a high school education and worked as a certified nurse assistant/aide ("CNA") at the time she became disabled.  In that role, she performed duties such as cleaning her clients' homes, managing their laundry, and lifting, bathing, and feeding them.  After she was diagnosed with MS, she transitioned from CNA into a companion role in which she worked with one client, keeping her company and taking her to appointments.  Plaintiff had previously worked as a customer service agent, appointment setter, and a teacher assistant.  Administrative Law Judge Stanley R. Hogg ("ALJ") denied Ms. Rankin's applications after an administrative hearing held September 10, 2014, at which Plaintiff was represented by counsel.  [#25-2 at 33-46].

At the administrative hearing, Plaintiff testified that she is "very weak," and cannot stand, sit, or lie down for more than a few hours at a time; her memory retention is poor; she must urinate frequently; she experiences very bad anxiety; and she is in constant pain due to her back, preventing her from bending or kneeling.  [#10-2 at 69].  In response to her attorney's questions

---

[2] For consistency and ease of reference, this Order uses the docket number assigned by the Electronic Court Filing ("ECF") system for its citations to the court file, e.g., [#___].  For citations to the Administrative Record, the court uses the ECF docket number and the page number associated with the Record, which is found at the bottom right-hand corner of the page. For documents outside of the Administrative Record, the court refers to the ECF docket number and the page number assigned by the ECF system, located in the tope right-hand corner of the page.

regarding these limitations, Plaintiff testified that she was diagnosed with MS in December 2012 and lost her CNA client two weeks after she was diagnosed, at which point she stopped working as a CNA. [#10-2 at 74]. At the time of diagnosis, she had lost all vision in her right eye and was weak to the point that she could not make up a bed. [*Id.* at 75]. Her memory quickly deteriorated and she could not remember appointments. The MS has caused the muscles in her hands to weaken and she cannot tightly grip items, such as a pencil, for longer than ten minutes without pain. [*Id.* at 81]. Plaintiff testified that due to pain and fatigue she lies down approximately four times a day, resulting in naps that total approximately six hours. [*Id.* at 70, 75]. She does not sleep well at night, and typically sleeps no more than five hours. [*Id.* at 75]. Plaintiff testified that she experiences sharp, intermittent pain in her lower back, which limits the amount of weight she can lift to approximately ten pounds. [*Id.* at 76]. The back pain also prevents her from sitting in a chair for longer than two hours at a time, after which she must stand or lie down. [*Id.* at 78]. Plaintiff also testified that she can walk one block without pain and can stand for approximately half an hour before she must sit. [*Id.*] Plaintiff frequently experiences the need to urinate, "[a]bout every 20 to 40 minutes," and each bathroom break lasts "about 10 minutes." [*Id.* at 78-79]. Plaintiff testified that she experiences anxiety, for which she takes medication, and that she is easily overwhelmed, experiences mood swings, and will "lash out." [*Id.* at 79]. At a young age, Plaintiff was diagnosed with a learning disorder; she testified that she continues to have trouble reading and that simple math sometimes takes her awhile to complete. [*Id.* at 80-81]. She was also diagnosed with asthma and continues to have problems with breathing, for which she uses an inhaler approximately twice a week. [*Id.* at 82].

The ALJ then prompted Plaintiff with questions about her testimony. In response, Plaintiff stated that she drives a car and also grocery shops approximately twice a month for "an

hour and a half to two [hours]," with the help of her mother or grandmother. [#10-2 at 84]. Plaintiff testified that she had continued working as a companion, approximately one day a week for an hour and a half, and earned between $200 and $500 a financial quarter. [*Id.* at 73, 84]. She also testified that vision in her right eye had improved although not returned entirely, and that she does not wear glasses but normal print is "very, very, very hard" for her to read. [*Id.* at 85-86]. Plaintiff correlated the pain in her lower back to activities that involve bending, such as removing clothes from the dryer and loading the dishwasher, but testified that she also experiences pain when she is merely standing or sitting. [*Id.* at 86]. The pain normally lasts for about thirty minutes, and she takes meloxicam as needed. In addition to laundry and washing dishes, Plaintiff cooks meals and will sit down during the meal preparation so as to rest. Plaintiff testified that she is not able to vacuum clean. [*Id.* at 87]. Plaintiff and her three children, aged three, seven, and ten years old, live with her mother and grandmother. The two older children play sports in recreational leagues and Plaintiff attends some of their sporting events. [#10-2 at 88-89]. Plaintiff's mother or grandmother will take the children to games when Plaintiff is not able. [*Id.* at 90].

Plaintiff's mother, Terry Ann Rankin, also testified. She has lived with her daughter and grandchildren since December 2013, and spoke to her observations of the day to day problems her daughter faces. Terry Ann Rankin described Plaintiff as easily frustrated, which "turns into…a lot of emotional mobility, where she'll get very angry and lash out." [#10-2 at 91-92]. She testified that her daughter appears to have a "bad day" several times a week, and seems very fatigued on those days. [*Id.* at 92]. Terry Ann Rankin also testified that she noticed these symptoms in Plaintiff prior to the MS diagnosis. [*Id.* at 93]. She further testified that her

daughter looks to her with help making decisions, help caring for the children, and help cleaning the house.  [*Id.* at 94-95].

The ALJ issued his written decision on October 31, 2014, concluding that Ms. Rankin was not disabled within the meaning of the Act from the alleged onset date, December 10, 2012, through the date of the written decision.  [#10-2 at 61].  Plaintiff timely requested that the Appeals Council review the ALJ's determination.  On March 14, 2016, the Appeals Council denied Plaintiff's request for reversal or remand.  The decision of the ALJ then became the final decision of the Commissioner.  20 C.F.R. § 404.981; *Nielson v. Sullivan*, 992 F.2d 1118, 1119 (10th Cir. 1993) (citation omitted).  Plaintiff filed this action on May 9, 2016.  This court has jurisdiction to review the final decision of the Commissioner.  42 U.S.C. § 405(g).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007).  The court may not reverse an ALJ simply because she may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted).  Moreover, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Massanari*, 271 F.3d 1256, 1260 (10th Cir. 2001), *as amended on denial of reh'g* (April 5, 2002).  *See also Lax v. Astrue*, 489 F.3d 1080, 1084

(10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.") (internal quotation marks and citation omitted). However, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted). Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) (internal citation omitted).

## ANALYSIS

### A.      Ms. Rankin's Challenge to the ALJ's Decision

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). Supplemental Security Income is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act. 42 U.S.C. § 1382. An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least twelve

consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214-15 (2002). Additionally, the claimant must prove she was disabled prior to her date last insured. *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(4)(v). *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations. *Id.*; *see also* 20 C.F.R. § 404.1520(e). If the claimant is unable to show that her impairments would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Williams*, 844 F.2d at 750. Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines what the claimant is still "functionally capable of doing on a regular and continuing basis, despite [her] impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751. The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, No. 14-1341, 2015 WL 3775669, at *2 (10th Cir. June 18, 2015) (internal quotation marks omitted) (citing *Winfrey v.*

*Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996) (noting that the step-four analysis includes three phases: (1) "evaluat[ing] a claimant's physical and mental [RFC]"; (2) "determin[ing] the physical and mental demands of the claimant's past relevant work"; and (3) assessing "whether the claimant has the ability to meet the job demands found in phase two despite the [RFC] found in phase one.")). "The claimant bears the burden of proof through step four of the analysis." *Neilson*, 992 F.2d at 1120.

At step five, the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education, and work experience. *Neilson*, 992 F.2d at 1120.

> . . . A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. The decision maker first determines the type of work, based on physical exertion (strength) requirements, that the claimant has the RFC to perform. In this context, work existing in the economy is classified as sedentary, light, medium, heavy, and very heavy. To determine the claimant's "RFC category," the decision maker assesses a claimant's physical abilities and, consequently, takes into account the claimant's exertional limitations (i.e., limitations in meeting the strength requirements of work). . . .
>
> If a conclusion of "not disabled" results, this means that a significant number of jobs exist in the national economy for which the claimant is still exertionally capable of performing. However, . . . [t]he decision maker must then consider all relevant facts to determine whether claimant's work capability is further diminished in terms of jobs contraindicated by nonexertional limitations.
> …
>
> Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain….

*Williams*, 844 F.2d at 751-52.  The Commissioner can meet his or her burden by the testimony of a vocational expert.  *Tackett v. Apfel*, 180 F.3d 1094, 1098–1099, 1101 (9th Cir. 1999).  Here, the ALJ did not have a vocational expert testify.

The ALJ first determined that Ms. Rankin was insured for disability through December 31, 2016.  [#10-2 at 50].  Next, following the five-step evaluation process, the ALJ determined that Ms. Rankin: (1) had not engaged in substantial gainful activity since the alleged onset date of December 10, 2012; (2) had severe impairments of "right optic neuritis, multiple sclerosis (MS), anxiety, mood disorder due to general medical condition, and depression"; and (3) did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.920(d)).  [#10-2 at 50-51].  At step four, the ALJ found that Plaintiff had an RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), which is described as "unskilled with occasional interaction with co-workers, supervisors, and the public." [#10-2 at 53].  The ALJ determined that Plaintiff was unable to perform any past relevant work, but found in considering her age, education, work experience, and residual functional capacity, that "there are jobs that exist in significant numbers in the national economy," that Plaintiff can perform.  [10-2 at 60].

First, Ms. Rankin takes issue with the ALJ's assessment of her credibility with respect to her functional impairment.  [#14 at 28-30].  Second, Ms. Rankin contends the ALJ's RFC findings are not based on substantial evidence nor adequately explained.  [*Id.* at 30-35].  Third, Ms. Rankin argues that the ALJ failed to adequately address "the disabling effects" of her pain in assessing her RFC.  [*Id.* at 35-36].  Finally, Ms. Rankin contends the ALJ erred at step five in

concluding that Defendant had met her burden of proving that jobs that Plaintiff can perform exist in the national economy. [*Id.* at 37-38].

**B.     The RFC Assessment**

Ms. Rankin's first three contentions implicate the ALJ's RFC determination. I find some merit in each of these arguments and thus remand the matter to the ALJ for further citation to the medical evidence in his assessment of Plaintiff's credibility, further consideration of Plaintiff's nonexertional impairments associated with MS, and further discussion of Plaintiff's complaints of back pain.

1.     *The ALJ's Review of the Medical Evidence*

a.     *Exertional Limitations*

The ALJ considered the following testimony and evidence. The record showed that on December 10, 2012, Plaintiff reported acute right eye vision loss for one week, along with poor balancing, tingling in her right lower extremity, and the inability to walk straight. *See* [#10-7 at 294-325]. The MRI imaging was consistent with optic neuritis, and showed six T2 white matter lesions that indicated a risk for MS but were not determinative. [*Id.* at 297]. After treatment with steroids, which began the same month, Plaintiff reported some improvement in her symptoms, including "very minimal" blurred vision, but also reported new symptoms, such as right foot paresthesia, increased fatigue, and low left-sided back pain. [*Id.* at 303]. Plaintiff also reported increased urinary frequency and urgency. [*Id.*] The MS diagnosis was confirmed on February 27, 2013, and Plaintiff's doctors began administering Gilenya (fingolimod). Examination of Plaintiff's right eye showed improvement to 20/60, but also some optic atrophy. [*Id.* at 307]. Jeffrey L. Bennett, M.D., Ph.D., noted that the examination showed a 30-micron loss on the OCT and significant RNFL loss, which, he opined, indicated recovery may be

incomplete and additional interventions would likely be futile. [*Id.*] Dr. Bennett noted that Plaintiff had not had "any additional exacerbations but has noticed a quick throbbing headache on the right or left side that lasts for 3 seconds," and which occurs three times a day. [*Id.*]

The ALJ concluded that these treatment notes indicated that Plaintiff suffers "significant limitations" due to MS and optic neuritis, but that the Gilenya treatment resulted in vision improvement, and that Plaintiff "did not develop any truly new symptoms associated with her [MS], other than struggling with fatigue and general weakness, and bladder frequency." [#10-2 at 55]. The ALJ then noted that even those symptoms improved. A February 2013 examination showed decreased sensory in the right upper and lower extremities and decreased vibration in all four extremities, but no spasticity in the legs, and normal fine movement. [*Id.*; #10-7 at 305; #10-9 at 458]. The ALJ also cited a March 1, 2013 treatment record that observed, "no evidence of acute exacerbation or symptoms at this time." [#10-9 at 449].

During a July 15, 2013 follow-up examination, Plaintiff complained of recurrent right-sided weakness. [#10-2 at 55]. Plaintiff reported feeling off balance, but denied any falls. There was no significant improvement noted with her optic neuritis, but her vision was 20/50. Plaintiff denied double vision or eye pain.

During an October 21, 2013 follow-up appointment, Dr. Bennett wrote that Plaintiff's prognosis was good. [#10-9 at 445]. He opined that her low back pain was mechanical in nature due to poor posture and weak core muscle, and that she had persisting gait deviation and restrictions on standing, walking, and exercising. [*Id.*] Dr. Bennett recorded a positive Romberg test; a normal gate but with narrow base; "5/5 motor strength in her arms with some give away"; "5/5 motor strength in the legs with normal tone and bulk"; and fine motor movement, "but slowed right to left." [#10-2 at 55 (citing #10-9 at 444)]. The ALJ noted that subsequent records

11

from November 2013 "showed no focal weakness or dizziness," despite Plaintiff's complaints of fatigue and poor balance. [*Id.* (citing #10-9 at 441)].

The ALJ next considered Plaintiff's February and March 2014 treatment records, which he found showed "mostly normal findings," citing improvement in her urinary frequency, accurate coordination, lack of spasticity, 5/5 motor strength in the upper and lower extremities, normal bulk and tone in the arms and legs, normal vibration, and fine motor movement, though still slowed right to left. [#10-2 at 56 (#10-9 at 435)]. The ALJ considered a repeat MRI of Plaintiff's brain, and noted the results "showed only a few new T2 hyperintense deep white matter lesions, but no enhancing lesion," and that the provider had opined there was a "mild burden disease." [*Id.* (citing (#10-9 at 438)]. The ALJ observed that the record, at that time, showed no new symptoms, still showed a positive Romberg test, and indicated that while Plaintiff's coordination was accurate, her tandem gait was abnormal. [*Id.*]

b.  *Nonexertional Limitations*

The ALJ considered the following evidence. The medical record showed that Plaintiff had a history of anxiety and depression dating to fall of 2011, after the birth of her third child. [#10-7 at 330]. She had historically responded well to Prozac, but stopped taking Prozac prior to the MS diagnosis. [*See id.*] In March 2013, her primary care provider started her on Paxil to address her complaints of anxiety and depression. [*Id.*] Plaintiff subsequently took Prozac for her depression and Xanax to control her anxiety. The record shows, as of July 15, 2013, that Plaintiff continued to take Prozac but also reported emotional lability. Subsequent records show that Plaintiff continued to report emotional lability with crying and anger. In August 2013, Plaintiff was prescribed Buspar and Celexa for anxiety and depression, both of which appeared to help her symptoms. [#10-8 at 338].

With respect to Plaintiff's cognitive function, the ALJ noted that approximately two months after the MS diagnosis, Plaintiff had a normal mental status examination, indicating that she had no problems related to word-finding, naming, repetition, or comprehension, and that her spontaneous speech was normal. *See* [#10-9 at 452, 458]. In July 2013, Plaintiff's mental status examination demonstrated that she was fully oriented, had normal attention, normal recent and remote memory, normal affect and mood, and that her responses were not slowed. [#10-9 at 446-447]. Again, Plaintiff showed no word-finding problems or problems with her speech and language. An October 2013 mental status examination was within normal limits, and records from follow-up appointments through March 2014 indicate that she was fully alert and demonstrated normal attention, displayed intact recent and remote memory and a normal mood and affect, and that her responses were not slowed. [#10-9 at 435, 440, 444-445]. The ALJ observed that the record failed to document any problems with speech, word-finding, or language.

Ms. Rankin's medical records reflect that she maintained a Global Assessment of Functioning ("GAF") score of 60 between April 2012 and May 2013, which decreased to 59 in October 2013. [#10-8 at 349, 352]. On April 9, 2014, Mary McClure, LCSW, opined that Plaintiff had a GAF of 58, indicative of moderate limitation. [#10-9 at 491]. In May 2014, Ms. McClure and Cynthia Wang, M.D., noted that Plaintiff reported feeling better, that she had more control over her anger, anxiety, and mood, and that she was yelling less. [#10-9 at 523, 525-526]. A mental status examination revealed no abnormalities and Plaintiff's GAF score was recorded as 59. [*Id.*] In July 2014, Dr. Wang noted that Plaintiff reported feeling stable, and that a recent cruise in Florida with her family had caused her stress but she felt she had appropriately managed the situation. Plaintiff reported taking Hydroxyzine "a few times," without much relief,

and had decided to focus on managing her anger. She reported that, overall, she felt her medications were working. [#10-9 at 515]. Dr. Wang noted that Plaintiff appeared quite stable, was managing the MS symptoms well, and appeared "ready to move onto focusing on interpersonal issues and anger." [#10-9 at 517]. One month later, Ms. McClure observed that Plaintiff appeared motivated with respect to therapy, participated in a constructive way and practiced effective communication skills. [#10-9 at 513-514]. In October 2014, Dr. Wang observed that Plaintiff was stable but still reported stress caused by her relationship with her grandmother and the demands of parenting. A mental status examination reflected that Plaintiff was in a "bad" but nonetheless "calm, euthymic, incongruent mood," with normal cognition, intact memory, average intelligence, and intact judgment. Dr. Wang assessed a GAF score of 60. [#10-9 at 508-509].

The ALJ observed that Plaintiff's mental status examinations had produced normal findings; her GAF score had improved from 58 to 60, "indicative of only moderate symptoms"; she reported that her medications helped, despite some residual stress; and Ms. McClure had opined that Plaintiff was improved. [#10-2 at 59]. The then concluded that Plaintiff's allegations regarding nonexertional limitations were "only partially credible." [*Id.*]

2. *Credibility Assessment*

Ms. Rankin's first contention implicates the ALJ's assessment of her credibility with respect to her exertional limitations. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013) (internal quotation marks omitted). An ALJ cannot

14

mischaracterize or downplay evidence to support his findings. *See Talbot v. Heckler,* 814 F.2d 1456, 1463-64 (10th Cir. 1987). And, although an ALJ need not "discuss every piece of evidence," he "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [#10-2 at 54]. He opined that the record did not show significant physical abnormalities, citing normal motor strength and muscle tone and bulk. He acknowledged that the positive Romberg tests might indicate a loss of balance, but noted that Plaintiff had accurate coordination and reported no falls, and had demonstrated that she walked with a normal gait even though it was a narrow base. He also observed that the results of the 2013 MRI compared to the results of the 2012 MRI "showed no significant deterioration in the claimant's condition." [#10-2 at 56]. The ALJ determined from these observations that Plaintiff's testimony regarding her limitations was not fully credible, and on the same basis discounted her mother's testimony. In support of his conclusion, the ALJ referenced Plaintiff's reports that she works one day a week as a companion, and, with help, cares for three children and prepares simple meals. [*Id.*] The ALJ wholly discounted Plaintiff's testimony that she naps approximately six hours a day as unsubstantiated anywhere in the record. He also discounted

Plaintiff's testimony regarding urinary frequency, stating that the record showed that the condition had improved over time.[3]

I find that the ALJ referenced some but not all of Plaintiff's physical impairments in his discussion of her credibility. For instance, he cited to the medical evidence regarding her coordination, motor strength in her upper and lower extremities, fine movement, and balance, and he concluded generally that the symptoms associated with her MS had improved with the administration of Gilenya. *See* [#10-2 at 55-56]. I will not reweigh the evidence that he considered. *See Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (the court's "limited scope of review precludes [it] from reweighing the evidence or substituting [its] judgment for that of the agency"); *Lax*, 489 F.3d at 1084 (on substantial evidence review, the court does not re-weigh the evidence or substitute its judgment for that of the Commissioner). However, as addressed more fully below, I find that the ALJ committed reversible error in failing to consider how certain impairments associated with Plaintiff's MS, even if improved, effected the RFC, and in failing to adequately address Plaintiff's complaints of back pain.

3. *Evaluation of Nonexertional Limitations*

Ms. Rankin asserts as her second contention that the ALJ failed to account for her nonexertional limitations in his assessment of her RFC. Specifically, Plaintiff argues that the ALJ failed to properly consider the cognitive effects of her depression and anxiety and of her learning disability, particularly with respect to literacy. [#14 at 35]. She also argues that, after recognizing her MS as a severe impairment, the ALJ failed to then consider the nonexertional limitations associated with the condition, such as her poor balance, sensitivity to heat, feelings of

---

[3] Plaintiff asserts that the ALJ incorrectly referred to her testimony as using the restroom "20 to 40 times during the day," when she had represented that she needs to use the restroom every 20 to 40 minutes. [#14 at 29]. However, the mistake is likely a scrivener's error, considering the ALJ accurately referenced the same testimony at an earlier section of his decision, [#10-2 at 53].

fatigue and weakness, and urinary problems associated with feelings of urgency and frequency. [*Id.* at 31-32, 33-34].   Finally, Plaintiff argues that the ALJ failed to consider whether environmental restrictions were necessary due to her asthma, which he recognized as a nonsevere impairment.   In response, Defendant asserts that the ALJ accommodated Plaintiff's credible mental health limitations, learning disability, and MS symptoms in limiting her to unskilled work.   [#15 at 15-16].   I find that the ALJ adequately considered Plaintiff's symptoms associated with depression and anxiety and those related to her learning disability, which I refer to collectively as nonexertional limitations not associated with MS.   However, I find that the ALJ improperly failed to address Plaintiff's complaints of fatigue and weakness with respect to the RFC, and improperly failed to discuss how, if at all, Plaintiff's bladder control issues, even if improved, impacted the RFC.   I also agree with Plaintiff that in determining that her asthma was a nonsevere impairment, the ALJ was then required to consider the effect of that impairment in the RFC assessment.

The ALJ acknowledged that Ms. Rankin testified that she had "anxiety, difficulty with word finding, and a learning disorder that caused mood swings, …felt overwhelmed…[and] had difficulty reading and doing simple math problems," but found her allegations "less than fully credible."   [#10-2 at 57].   As described above, the ALJ reviewed the medical record with respect to Plaintiff's depression and anxiety and learning abilities, and determined that an RFC of unskilled light work would adequately accommodate these limitations.   [#10-2 at 59-60].   I find that there is substantial evidence in the record to support this conclusion.

I do not agree with Defendant, however, that an RFC assessment of unskilled light work necessarily accommodates the complained-of MS symptoms related to fatigue, weakness, and bladder control without any independent discussion of those symptoms.   *See Clark v. Barnhart*,

64 F. App'x 688, 691 (10th Cir. 2003) ("the ALJ also had to consider any other limitations [claimant with MS] may have, such as the chronic disabling fatigue of which she complains."). The objective medical evidence before the court establishes that Plaintiff suffers from MS, which can "reasonably be expected to produce" the symptoms she has alleged. *Id.* (citing 20 C.F.R. § 404.1529(b); *Young v. Apfel,* 221 F.3d 1065, 1067 n.3 (8th Cir. 2000) (noting that symptoms of multiple sclerosis "include muscle weakness, numbness, fatigue, loss of balance, pain, and loss of bowel and bladder control")). The ALJ recognized that Plaintiff alleged these symptoms, *see* [#10-2 at 53], but then failed to consider their effect in his RFC assessment.[4] For instance, the ALJ observed at step four that Plaintiff "did not develop any truly new symptoms associated with her multiple sclerosis, other than struggling with fatigue and general weakness, and bladder frequency. However, the record showed that even these symptoms improved." [*Id.* at 55]. I find that the ALJ was then required to discuss how these symptoms, even if improved, would impact, if at all, Plaintiff's ability to do work in the national economy.

The record includes the following complaints regarding fatigue, weakness, and urinary urgency. In March 2013, Plaintiff complained of fatigue and reported that she takes naps during the day. [#10-9 at 449]. In October 2013, Plaintiff again reported fatigue, stating that she "struggles" with it "all the time," and spoke of general weakness. [*Id.* at 443]. She reported feeling "very fatigued" the following month. [*Id.* at 441]. In February 2014, Plaintiff complained of fatigue, along with "imbalance," vertigo, and ascending stairs. [*Id.* at 439]. In July 2014, Plaintiff stated during a therapy session that she "feel[s] weak from the MS and needs to take breaks as needed at home." [*Id.* at 518].

---

[4] Of the symptoms Plaintiff alleges in her opening brief, the court notes that there is no record of an ailment due to heat sensitivity. Plaintiff did not mention heat sensitivity in her testimony before the ALJ and this symptom is not memorialized in her medical records.

With respect to bladder control, in March 2013, Plaintiff reported "some increased frequency," and that she was drinking more water. Notes from that visit state, "frequency better since last visit." [#10-9 at 433-434]. Plaintiff's treatment records from October 21, 2013 similarly state, "frequency better since last visit." [*Id.* at 443]. The treatment records from February 19, 2014 state simply: "Bladder Problems: frequency." [*Id.* at 439]. The treatment records from the following month state that Plaintiff "is having some increased frequency but is drinking more water." [*Id.* at 433]. While the ALJ concluded that Plaintiff's testimony regarding her need to use the restroom every 20 to 40 minutes, consistently throughout the day, for 10 minutes at a time, was not wholly credible, he did not discount the condition altogether. Rather, he wrote that the record does not include any report from Plaintiff to a provider regarding the specific frequency to which she testified, and that the "record shows an improvement in the claimant's urinary frequency." [#10-2 at 56]. This court recognizes support for the ALJ's conclusion that Plaintiff's urinary urgency appears to have improved over time, but observes that the record provides no contextual information with which to qualify the improvement. I agree with Plaintiff that the salient question is not whether her condition improved, but "whether there were competitive jobs she could do in the national economy in light of the functional impairments that remained," and that the ALJ failed to address this question. [#14 at 29]. *Cf. Kohler v. Astrue,* 546 F.3d 260, 268 (2d Cir. 2008) (error for ALJ to interpret the term "stable" as "good" where it is possible that claimant was "stable at a low functional level"). With no further explanation for why the ALJ omitted these symptoms from the RFC, I cannot conclude that the RFC is supported by substantial evidence in the record.

Finally, the ALJ erred when, after concluding at step two that Plaintiff's asthma constituted a nonsevere impairment, [#10-2 at 51], he then failed to consider at step four the

impact of the impairment on Plaintiff's other medically determinable impairments. *See Hill v. Astrue,* 289 F. App'x 289, 292 (10th Cir. 2008) ("In determining the claimant's RFC, the ALJ is required to consider the effect of *all* of the claimant's medically determinable impairments, both those he deems 'severe' and those 'not severe.'") (citation omitted). *See also Grotendorst v. Astrue*, 370 Fed. App'x 879, 884 (10th Cir. 2010) ("[O]nce the ALJ decided…that Ms. Grotendorst's mental impairments were not severe, she gave those impairments no further consideration. This was reversible error."). The ALJ's failure to explain why Plaintiff's asthma had an impact, or none at all, on the other impairments precludes this court from conducting a review for substantial evidence.

On remand, the ALJ may again omit from the RFC restrictions regarding bladder control, fatigue, and weakness. If such be the case, he should explain the significance of the improvement in symptom on Plaintiff's ability to do work. The ALJ may also find that asthma has no exacerbating effect on Plaintiff's other impairments, but he should explain his reasoning. It may be that the ALJ needs to further elucidate his reasoning, but arrives at the same result. But if the ALJ should determine on remand that additional medical evidence is required regarding these symptoms, the ALJ should comply with his duty to develop the record. *See Maes v. Astrue,* 522 F.3d 1093, 1097–1098 (10th Cir. 2008); 20 C.F.R. § 416.912(b).[5]

---

[5] I note as unavailing the ALJ's brief reference to "additional limitations" having "little or no effect on the occupational base of unskilled light work," referring to "many light occupations that do not require more than occasional interaction with co-workers, supervisors, and the public." [#10-2 at 60]. The degree of interaction between Plaintiff and other individuals is not relevant to fatigue, weakness, or bladder control. *Cf. Clark*, 64 F. App'x at 691 (holding that ALJ's broad reference to "other limitations" was made in the context of pain, not chronic fatigue, and thus the reference could not subsume plaintiff's complaints of fatigue).

4.    *Assessment of Pain*

Ms. Rankin asserts as her third contention that the ALJ's RFC assessment failed to adequately address her allegations of back pain, spasticity, and parathesias caused by her MS. [#14 at 35]. Defendant responds that this argument is "essentially a request" for the court to reweigh the ALJ's treatment of the medical source opinions and is without basis. [#15 at 17]. As mentioned above, I find the ALJ did not sufficiently address Plaintiff's complaints of pain.

The ALJ was required to consider all the relevant objective and subjective evidence and "decide whether he believe[d] the claimant's assertions of severe pain." *Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir. 1987). In evaluating complaints of pain, the ALJ must consider and determine:

> (1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether the impairment is reasonably expected to produce some pain of the sort alleged (what we term a "loose nexus"); and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's pain was in fact disabling.

*Brownrigg v. Berryhill*, --- F. App'x ----, 2017 WL 2179113, at *2 (10th Cir. Apr. 19, 2017) (quoting *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166-67 (10th Cir. 2012)). Ancillary to this analysis is the consideration of factors such as "a claimant's persistent attempts to find [pain relief] and [her] willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor…and the claimant's daily activities, and the dosage, effectiveness, and side effects of medication." *Id.* (quoting *Keyes-Zachary*, 695 F.3d at 1167). *See also* SSR 16-3P, 2016 WL 1119029, at *7 (Mar. 16, 2016) (listing similar factors to consider in evaluating intensity, persistence, and limiting effects of a claimant's symptoms).

The "ALJ need not consider these factors in a formalistic way, but the substance must be there." *Id.*

Plaintiff testified that she experiences sharp lower back pain approximately every other day, which affects her ability to lift items. [#10-2 at 69, 76]. The pain lasts for about thirty minutes and she takes meloxicam occasionally, as needed. [*Id.* at 86-87]. In an effort to reduce her reliance on medication, she first attempts to alleviate the pain by lying or sitting down. Plaintiff testified that the pain limits her to lifting no more than ten pounds at a time. The ALJ acknowledged that Plaintiff had reported her back pain to her primary care physician, who had opined that it was "probably musculoskeletal in nature." [#10-2 at 54]. After summarizing the testimony offered by Ms. Rankin and her mother, including testimony regarding back pain, the ALJ concluded generally that while Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms…the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." [#10-2 at 54]. Thus, to the extent the ALJ found that Plaintiff had established an underlying medically determinable physical impairment that could produce the alleged symptoms of back pain (and this is not entirely clear), he was then required to consider the additional *Luna* factors. The ALJ erred in failing to articulate his findings with respect to Plaintiff's complaints of pain.

This court's review of the medical record found several instances of Plaintiff complaining about lower back pain. The record of a February 2013 examination includes Dr. Bennett's notes indicating that Plaintiff complained of new symptoms including right foot paresthesias and low left-sided back pain. [#10-9 at 457]. Dr. Bennett noted that she had started Mobic for the pain and had experienced some relief. [*Id.* at 456]. In October 2013, Dr. Bennett noted that Plaintiff

"struggles most with some low back pain on left side that does not radiate." [*Id.* at 443]. In November 2013, Plaintiff again complained of back pain, and reported that the pain had worsened in the past year and was exacerbated by standing. [*Id.* at 441]. In February and March of 2014, she reported pain in her lower back, which she attributed to MS. [*Id.* at 439, 434]. The ALJ did not cite to or address these records, nor did he discuss the *Luna* framework. *See Carpenter v. Astrue*, 537 F.3d 1264, (10th Cir. 2008) ("the regulations require the ALJ to 'consider all evidence in [the] case record when [he] makes a determination or decision whether [claimant is] disabled' [ ] and this court requires the ALJ to discuss 'the significantly probative evidence he rejects'") (quoting 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3); *Clifton*, 79 F.3d at 1010). Additionally, I do not find that the ALJ's consideration of the expert medical opinions serves as a substitute for the discussion of Plaintiff's complaints of pain, because it is clear from the written decision that, to the extent any of the medical experts opined on Plaintiff's pain, the ALJ did not consider those parts of the opinions in rendering his disability determination. *See* [#10-2 at 57-59]. On remand, the ALJ should specifically state his assessment of Plaintiff's credibility with respect to her subjective complaints of back pain and should cite to the record for support. *See, e.g.*, *Hardman v. Barnhart*, 362 F.3d 676, 679-80 (10th Cir. 2004) (rejecting ALJ's pain analysis as boilerplate, with no attempt to link factors to evidence, in a case where the claimant persistently complained of pain and sought treatment); SSR 16-3P, 2016 WL 1119029, at *9 (instructing that the "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms").

In light of these findings, I decline to address Plaintiff's final contention that the ALJ erred at step five.

## CONCLUSION

For the reasons set forth herein, the court hereby **REVERSES AND REMANDS** for further consideration at step four of how Plaintiff's physical and nonexertional limitations associated with MS would impact her RFC, if at all, whether asthma exacerbates any of Plaintiff's other impairments, and whether Plaintiff's complaints of pain are substantiated in the record.


DATED: July 6, 2017                                    BY THE COURT:


                                                       s/ Nina Y. Wang_____
                                                       United States Magistrate Judge